**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TIMOTHY PERMENTER,

      Petitioner,

v.                                    CASE NO. 8:12-cv-1622-T-30TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS, et al.,

      Respondent.

_____/

## ORDER

Petitioner, an inmate in the Florida penal system, proceeding *pro se* brings this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Dkt. 1).  The Court has considered the Petition, Respondent's response, (Dkt. 11), and Petitioner's Reply (Dkt. 16). Upon review of the briefs and the record, the Court determines the petition must be denied.

## BACKGROUND

On October 24 , 2007, a jury convicted Petitioner of the first-degree murder of Karen Pannell (the "Victim"), his girlfriend at the time of her death, sometime between the evening of Friday, October 10, 2003, and the early morning hours of Saturday, October 11, 2003. The jury voted seven to five in favor of the death penalty, but the trial court sentenced Petitioner to life in prison without the possibility of parole.  Petitioner appealed his conviction to the Second District Court of Appeal, raising whether:

1.   the trial court erred by denying Petitioner's judgment of acquittal motion as to first-degree murder;

2.   the trial court erred in failing to grant a motion for mistrial when a State's witness revealed Petitioner's past criminal history;

3.   the trial court erred in not granting a continuance when Petitioner's trial counsel, Robert McClure, became ill during trial;

4.   the trial court erred in allowing into evidence a recording of an interrogation that was not redacted as agreed; and

5.   the trial court's errors set forth in question two and four, when viewed cumulatively, were harmful.

On August 13, 2010, the state appellate court affirmed the judgment and sentence per curiam without written decision. *Permenter v. State*, 44 So.3d 589 (Fla. 2d DCA 2010) [table]. Petitioner filed a motion for rehearing on August 28, 2010, which the state appellate court also denied on September 22, 2010.

On February 2, 2011, Petitioner filed a *pro* se Motion for Post-Conviction Relief in state court pursuant to Florida Rule of Criminal Procedure 3.850, raising one claim of ineffective assistance of counsel:  "Trial counsel was ineffective due to an illness which diminished his faculties during trial."  (Dkt. 13 Ex. 1 vol. 10, Petitioner's 3.850 Motion). Petitioner contended the illness of one of his two lawyers, Robert McClure ("McClure"), rendered McClure an ineffective counsel.  But, Petitioner did not  point to any specific act or failure of McClure, other than Petitioner's conviction, identifying any ineffective assistance or prejudice resulting therefrom.  On June 24, 2011, Petitioner appealed the state post-conviction court's denial of his Rule 3.850 Motion for Post-Conviction Relief.  The

Second District Court of Appeal affirmed the post-conviction court's denial *per curiam* without written decision on April 13, 2012. *Permenter v. State*, 96 So. 3d 897 (Fla. 2d DCA 2012) [table]. The mandate issued on May 1, 2012.

On July 17, 2012, Petitioner timely filed this § 2254 petition for habeas relief raising the same grounds he raised in his 3.850 motion and appeal.

## STANDARD OF REVIEW

Since Petitioner's conviction was entered after the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), his petition is subject to the provisions thereof. When a federal court is asked to review a criminal conviction from state court, 28 U.S.C. § 2254 places a heavy burden upon the petitioner. Habeas relief is only available for petitioners in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). Habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim resulted in a decision that:

> (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or

> (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Williams v. Taylor*, 529 U.S. 362 (2000).

In *Williams*, the Supreme Court held:

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a

question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13.

Even where a state court denies an application for post-conviction relief without written opinion, that decision is entitled to the same deference as if the state court had entered written findings to support its decision.  *See Wright v. Sec'y of Dep't of Corrs.*, 278 F.3d 1245, 1255 (11th Cir. 2002).  Where no Supreme Court precedent is on point, or the point is ambiguous, it cannot be said that the state court's conclusion is contrary to clearly established federal law. *Mitchell v. Esparaza*, 540 U.S. 12, 17 (2003).  "[A] state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [Supreme Court] opinions. . . . [A] state court need not even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Id.* at 16 (quoting *Early v. Packer*, 537 U.S. 3, 7-8 (2002)).  Additionally, federal habeas relief is available under the "unreasonable application" standard only if the state court's application of clearly established federal law was "objectively unreasonable." *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001).  Regarding the second standard, a state court's determinations of fact shall be "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003).  This statutory presumption of correctness applies only to findings of fact made by the

state court, not to mixed determinations of law and fact. *McBride v. Sharpe*, 25 F.3d 962, 971 (11th Cir. 1994)**.**

## Exhaustion of State Remedies

Before seeking federal habeas relief, a state prisoner must satisfy the exhaustion requirement of 28 U.S.C. § 2254(b)(1).  "To fully exhaust state remedies, the petition must 'fairly present[ ]' every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Isaac v. Augusta SMP Warden*, 470 F. App'x 816, 818 (11th Cir. 2012) (unpublished) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)); *see Baldwin v. Reese*, 541 U.S. 27, 30-32 (2004).  In order to present properly a federal constitutional claim in state court, a petitioner "'must make the state court aware that the claims asserted present federal constitutional issues.'" *Zeigler v. Crosby*, 345 F. 3d 1300, 1307 (11th Cir. 2003) (quoting *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998)).

"'If  state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.'" *Id.* (quoting *Duncan v. Henry*, 513 U.S. 364, 115 S. Ct. 887, 888 (1995)).  "'It is not enough that all the facts necessary to support the federal claims were before the state courts, or that a somewhat similar state-law claim was made.'" *Id.* (quoting *Anderson v. Harless*, 459 U.S. 4, 103 S. Ct. 276, 277 (1982) (citations omitted)).  "'[T]o exhaust state remedies, petitioners must do more than present "the state courts only with the facts necessary to state a claim for relief" and must additionally articulate the constitutional theory serving as the basis for relief.'"  *Id.* (quoting *Henry v.*

*Dep't of Corrs.*, 197 F.3d 1361, 1366 (11th Cir. 1999)).  "[A] habeas applicant [must] do more than scatter some makeshift needles in the haystack of the state court record[.]" *McNair v. Hall*, 416 F.3d 1291, 1302-03 (11th Cir. 2005) (internal citations omitted).

Any issue that was not exhausted at the state level and that can no longer be litigated according to the state's procedural rules is procedurally defaulted and thereby barred from federal review.  *See O'Sullivan v. Voerckel*, 526 U.S. 838, 845 (1999); *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999).   A claim is also barred from federal review if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *Coleman v. Thompson*, 501 U.S. 722, 734-35 & n.1 (1991). Accordingly, a federal court must determine whether future attempts to litigate in state court an unexhausted issue would be futile under the state's procedural default doctrine.  *Bailey,* 172 F.3d at 1303.

A petitioner may overcome a procedural default, such that a federal habeas court may reach the merits of a claim, if he shows either cause and prejudice or demonstrates a fundamental miscarriage of justice would result due to the default.  *Kelly v. Sec'y for Dep't of Corrs.*, 377 F.3d 1317, 1345 (11th Cir. 2004).  "For cause to exist, an external impediment . . . must have prevented [a] petitioner from raising the claim."  *McCleskey v. Zant*, 499 U.S. 467, 497 (1991) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  To  demonstrate a fundamental miscarriage of justice, a petitioner must establish "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  "To establish the requisite probability, the petitioner must show that

it is more likely than not that no reasonable juror would have convicted him." *Id.* at 327.  A claim that a constitutional violation has probably resulted in the conviction of an actually innocent petitioner "is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *Id.*

**Ineffective Assistance of Counsel**

The law regarding ineffective assistance of counsel claims is well-settled and well-documented.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

*Strickland* requires proof of both deficient performance and consequent prejudice. *Id.* at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998) ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions

in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. *Strickland* requires a petitioner show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*.

In addition, a petitioner must demonstrate that counsel's error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691-92. To meet this burden, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

## **DISCUSSION**

The Court will now address each of Petitioner's claims.

**Ground One:**     The trial court erred in failing to grant motion for mistrial when state witnesses revealed Petitioner's past criminal history.

**Ground Three:**   The trial court erred in allowing into evidence a recording that was not redacted.

In support of ground one, Petitioner argues that non-responsive testimony of state witness George Solomon, Petitioner's roommate at the time of the Victim's murder, improperly alluded to Petitioner's prior criminal history, thereby violating Petitioner's Sixth

Amendment right to a fair and impartial trial.  In support of ground three, Petitioner argues the State failed to properly redact State's Exhibit Number 24 (the "Tape"), a taped voluntary interview of Petitioner by law enforcement on October 17, 2003, played for the jury at Petitioner's trial.  Here, too, Petitioner claims the Tape contained references to Petitioner's past criminal history and incarceration, violating his Sixth Amendment right to a fair and impartial trial.  In its table opinion, the state appellate court affirmed Petitioner's judgment and sentence, including the trial court's rulings, thereby denying on appeal those issues Petitioner now raises as grounds one and three.

Ground one is procedurally barred from federal habeas review.  Petitioner did not fairly present this claim in state court, and attempts to litigate it in state court now would be futile as the time for Petitioner to do so has expired.  *See* Fla. R. App. P. 9.140(b)(3) (giving a defendant thirty days to appeal from a sentence in Florida state court).  In his state appeal, (Dkt. 13 Ex. 3, Supplemental Initial Brief, 12-16), Petitioner raised this ground only as trial court error, not as a violation of any federal constitutional right.  Petitioner did not cite Supreme Court law or other federal cases addressing this claim in state court.  He cited state cases, and only one of these even mentioned constitutional issues or federal claims.[1]

---

[1] The only case that does mention a constitutional issue is *State v. Contreras*, 979 So. 2d. 896 (Fla. 2008).  That case dealt with a defendant's Sixth Amendment Confrontation Clause rights and the federal case of *Crawford v. Washington*, 541 U.S. 36 (2004), in the context of whether a discovery deposition can satisfy the *Crawford* requirement of giving defendants a prior opportunity for cross-examination of a witness.  *Contreras* does that not address the same issue raised by Petitioner.  This mention of the Sixth Amendment is insufficient to present fairly the federal constitutional issue here.

Even were ground one not procedurally barred, it would fail. By way of explanation only, the Court will discuss the merits of the claim. Evidentiary errors by state courts do not generally rise to the level of constitutional magnitude required to warrant habeas relief. *See Evans v. Verdini*, 466 F.3d 141, 145 (1st Cir. 2006) (citing *Kater v. Maloney*, 459 F.3d 56, 64 (1st Cir.2006)) ("Violation of a rule of evidence does not itself amount to a constitutional violation, which is a necessary predicate for a habeas claim."); *cf. Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (citing and quoting *Patterson v. New York*, 432 U.S. 197, 201-202 (1976)) (finding the evidentiary rulings of state courts rise to the level of due process violations only if they offend "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.").

For an evidentiary error to give rise to a violation of the Sixth Amendment's right to a fair and impartial trial, the error "must deny a criminal defendant fundamental fairness in order to be cognizable in a habeas proceeding." *Williams v. Kemp*, 846 F.2d 1276, 1282 (11th Cir. 1988). The Eleventh Circuit Court of Appeals has stated:

> We review state court evidentiary rulings on a petition for habeas corpus to determine only whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial. Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a crucial, critical, highly significant factor in the [defendant's] conviction.

*Jacobs v. Singletary*, 952 F.2d 1282, 1296 (11th Cir. 1992) (alteration in original) (citations and internal quotation marks omitted). "Rarely will an evidentiary ruling render a trial fundamentally unfair and correspondingly federal habeas corpus relief is rarely deemed appropriate for claims predicated on allegations of state evidentiary error." *Nebel v. Sec'y,*

*Dep't of Corrs.*, No: 8:03-CV-1731-T-30TBM, 2006 U.S. Dist. LEXIS 15151, at *1, *8

(M.D. Fla. 2006) (citing *Boykins v. Wainwright*, 737 F.2d 1539, 1543-44 (11th Cir. 1984));

*see also Kater*, 459 F.3d at 64 (stating regarding rulings on evidence's prejudicial versus

probative nature, "On extreme facts, it may be theoretically possible to find that a state

court's evaluative judgment . . . was such an unreasonable application of . . . federal

constitutional standards as to result in a fundamentally unfair trial.  In practice, such a case -

if one exists - will be very rare.").  Indeed, the Supreme Court has defined the category of

evidentiary errors that violate "fundamental fairness" very narrowly.  *Dowling v. United*

*States*, 493 U.S. 342, 352 (1990).

The basis of ground one, the disputed testimony of Solomon, came in the context of

his direct examination by the State.  Solomon testified in part that on the night of October 10,

2003, Petitioner "said that he had killed Karen. He said - - his words were, 'I did it.  She's

dead.  I killed her.'" (Dkt. 13 Ex. 1 vol. XI, Trial Tr. 501, Oct. 18, 2004).  Later during direct

examination, the following exchange occurred between the State and Solomon:

> Q:    All right.  What else did he tell you about having done it, or what did
>       you say to him?
> A:    I asked him, you know, [w]hat are you going to do?  There was a lot of
>       - - a lot of silence, mostly silence.
> Q:    Okay.  Did you ask him or tell him that he was going to go to jail for
>       this or anything like that?
> A:    I told him that I - - my opinion was I thought he needed to do the right
>       thing, and those were the words I used.  **And he says, I don't want to
>       go back to jail**.
> Q:    Okay.  Did - - did he explain to you at any time what he had done or
>       what he would - - to keep him from being caught?
> A:    I - - **he expressed to me that he was never going to go back to jail**.
> Q:    I understand that, but what - -

(Dkt. 13, Trial Tr. 504) (emphasis added).   It is important to note the trial court and Petitioner agreed the State did not intentionally elicit Solomon's offending comments.  The State addressed that point, saying, "I just want the Court to know - - and this is really just for the record.  In previous discussion with [Solomon] today, I specifically said, [d]o not mention probation or anything about [Petitioner's] prior record."  (Dkt. 13, Trial Tr. 521).

In light of the above testimony, the Defense asked the trial court for permission to approach, the trial court had the jury and Solomon exit the courtroom, and then defense counsel Dudley Clapp ("Clapp") immediately moved for a mistrial "based upon the testimony of [Solomon] that [Petitioner] . . . did not want to go back to jail, thus indicating [Petitioner] had a criminal record."  (Dkt. 13, Trial Tr. 505).   Defense counsel McClure added:

> The agreement that we had with the State said they could mention probation; that, necessarily, later on there would be these - - these inmates in a jail.  But that doesn't presuppose that the jury would learn he's already been to jail. They're going to think this is a more serious offense by virtue of that, that his past record is more serious, and they'd otherwise be entitled to it.  You know, the problem is you can't unring a bell. . . . I think it's just damaging beyond, you know, anything we can correct.

(Dkt. 13, Trial Tr. 508-09).  The State argued in part that all the jury knew at that point was that Petitioner had said, "I'm not going back to jail[,]" and that the jury already knew at that point, the third day of trial and the second day the jury was hearing the case, that Petitioner had been on probation and was jailed for violating probation.  (Dkt. 13, Trial Tr. 510).  The State also asserted Solomon's statements were innocuous and that, in light of all the other evidence already admitted and that would be coming in, Solomon's statements were not

"going to amount to anything in comparison." (Dkt. 13, Trial Tr. 513). Finally, the State

suggested a curative instruction could be given if defense counsel wished.

The trial court denied the motion for mistrial, reasoning:

[W]e have a situation where it's already out there that the defendant was on probation at the time. It's already out there that the defendant was on probation at the time. It's already out there that he was arrested for a violation of probation. . . . And we've got more evidence that I haven't heard yet that - - I don't know what it is, but it's coming in about he's in jail and he's talking and he says this or he doesn't say that or whatever. . . . And, certainly, this isn't a situation where, [the jury may think] ["]oh, [Petitioner has] been in jail before? That's a bolt out of the blue. I had no idea.["] I mean, certainly, the suggestion has been there. I think the appropriate thing to do is I will, first of all, give a curative instruction to the - - and I understand the argument - - all of us have been in this business a long time. I understand you can't unring a bell. I'm going to give a curative instruction that they're to disregard that, unless the Defense doesn't want me to. And I'm going to instruct Mr. George Solomon not to say that again. . . . Now, let me be clear. If this happened in a case where there was no mention of the defendant having any criminal history at all and it was a police officer sitting there and threw that in, that probably would be a valid motion for mistrial[.] . . . But I'm not going to do that in this case because of the matters that I've discussed.

(Dkt. 13, Trial Tr. 516-19).

Here the record does not establish that Solomon's statement about Petitioner's prior

criminal history was a crucial or highly significant factor in Petitioner's conviction. This is

especially the case in light of several factors.[2] First, the statement that Petitioner did not want

to return to jail paled in comparison to Solomon's preceding testimony that Petitioner

---

[2] The Court notes that the jury eventually heard Petitioner testify that he had sixteen prior felony convictions and the State highlight glaring inconsistencies between Petitioner's testimony and his statements to law enforcement during the course of the investigation of the Victim's murder. Nonetheless, because Petitioner claims he would not have taken the stand but for the jury hearing Solomon's statements that Petitioner did not want to go back to jail, the Court has not relied on Petitioner's testimony, especially his admission of prior felonies and inconsistencies therein, in this order.

confessed to murdering his girlfriend with a knife a few hours before meeting Solomon on the night of October 10, 2003.  (Dkt. 13, Trial Tr. 502-03).  Second, the trial judge gave a curative instruction to the jury: "I want you to disregard the testimony of Mr. Solomon just a few minutes ago that the defendant said that he didn't want to go back to jail.  Please disregard that."  (Dkt. 13, Trial Tr. 523).  This instruction matters because "[a] jury is presumed to follow its instructions."  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  Third, the jury already knew Petitioner had some kind of criminal history, having heard he was on probation and had been arrested for violation of that probation.  Later, the jury would also learn that Petitioner confessed he murdered the Victim to a fellow inmate, William Gill, during Petitioner's jail stay for violating probation.  Finally, the State did not intentionally elicit Solomon's statements alluding to Petitioner's prior criminal history.

Ground three is based on the following two statements by a detective from the Tape: "But the - - then I also can't think - - don't think you're a bad guy, okay?  I know your past, okay?  I'm sure that the State of Florida did not do one thing to help you in - - in the entire time[,]" and "I don't know your situation - - if you were in college before, what happened back then or what.  But you're a smart enough guy that you got out and got yourself a job, and nobody helped you."  (Dkt. 13 Ex. 1 vol. XIII, Trial Tr. 943, Oct. 19, 2007).

Petitioner objected that "those statements were made by Detective Holbrook, which clearly indicate that - - strongly suggest, if not outright state, that [Petitioner] had had some sort of incarceration in prison."  (Dkt. 13, Trial Tr. 962).  The State argued those statements were "open for a lot of interpretation" and that the tapes had existed since the murder had

taken place four years prior to trial without any objection from the Defense regarding the statements.  (Dkt. 13, Trial Tr. 962-63).

The State also argued the jury did not know anything beyond what it had heard, and the statements were not necessarily damaging in light of the whole conversation, where, "in the same sentence there, they're talking about . . . what a great guy [Petitioner] is and how . . . [the detectives] don't think that he killed [the Victim] . . . premeditatedly[.]" (Dkt. 13, Trial Tr. 962-63).

The trial court stated:

> To the extent that [Petitioner] wants to register an objection to this particular part of the transcript, that objection is noted. . . . Now, this tape, first of all, . . . [i]t was admitted into evidence without objection.  The redacted copy of it was available.  We've already passed that point.  I think that point is ambiguous.  I can see the construction of it that the Defense is placing on it. I can see the arguments for the construction of it that the State is placing on it. It is certainly ambiguous.  But it's already in evidence, and we've already passed that point.  They've already heard it, and they've already read it.  And so I - - that objection is overruled.  It was - - it's gone too far.  It's already in evidence.  We've already passed that up."

(Dkt. 13, Trial Tr. 964-65).

The record does not establish that the detective's statements constituted a violation of Petitioner's Sixth Amendment right to a fair and impartial trial.  They were not a crucial, highly significant factor in his conviction.  By the time the jury heard the Tape, it was the fourth day of trial and the third day of testimony.  The jury had already heard the facts discussed above in ground one.  The jury had also heard contradictory statements Petitioner had made to law enforcement.

First, the jury had already heard eye-witness testimony from the Victim's neighbors placing Petitioner's car, a BMW, at the Victim's home beyond when he told law enforcement he had left her home, without returning until the next morning, October 11, 2003, at 10:30 a.m., when he claimed he discovered her body.  Mickele Fincher, who lived directly across the street from the Victim's home, testified she saw Petitioner's car in the Victim's driveway at some point between 2:00 a.m. and 2:30 a.m. on Saturday, October 11, 2003.  Casey Miller, the Victim's next-door neighbor, testified that he arrived at home no earlier than 10:10 p.m. on Oct. 10, 2003, and he had trouble getting into the driveway he  shared with the Victim because the neighbor's BMW was parked improperly in the driveway.  Mark Stoffer lived on Dover Court, a street immediately south and parallel to the Victim's street, Montego Court.  On the morning of October 11, 2013, between 5:00 a.m. and 5:30 a.m., Stoffer took his dog, a poodle, for their customary walk.  When they came to the Victim's home, his poodle jerked toward the Victim's home, straying from their normal walking path, which the dog had never done before.  The dog went up to the bushes by the front door of the Victim's home and began sniffing all around the front of the home, refusing to leave.  Stoffer testified, "I picked up the dog, and I wasn't paying attention to where I was going, and I bumped into a car."  (Dkt. 13 Ex. 1 vol. XII, Trial Tr. 820).  He testified the car he bumped into was a BMW convertible with its top down, parked behind the Victim's car.  Law enforcement established the car in all three eye-witness accounts was the Petitioner's BMW.

Second, the jury had heard inconsistencies between the timeline Petitioner gave law enforcement regarding his whereabouts and where cellular telephone records showed he was

on the night of October 10, 2003.  For example, Petitioner had told detectives he had called Solomon on Friday night, October 10, 2003, from Petitioner's apartment, but tower records showed the call was placed about three blocks from the Victim's home at 9:32 p.m. on October 10, 2003.  That also contradicted Petitioner's claim to law enforcement that he had left the Victim's home before then and had not returned until the following morning.

Third, the jury had also heard the testimony of Richard Davis, a Pizza Hut employee, who testified he had seen Petitioner in the Victim's home when he delivered pizza there around 9:00 p.m. on October 10, 2003.  That, too, contradicted Petitioner's claim to law enforcement that he had left the Victim's home before that time and had not returned.

Finally, the jury had heard the testimony of William Gill.  Gill was Petitioner's fellow inmate at Leon County Jail for three to three and a half months.  Gill testified that he and Petitioner had discussed the Victim's murder.  Gill's testimony included the following, where the State asked him questions on direct examination:

> Q:    . . . [D]id [Petitioner] tell you that he was suspicious that somebody had rolled or turned on him, or did he say in reference to what?
> A:    Yes.  It was - - he said at that point it was in reference to a murder that had happened down here in the county.
> . . .
> Q:    Okay.  And had you read any newspapers or looked at, saw on TV or anything about a murder that occurred in Pinellas County?
> A:    No, sir.
> . . .
> Q:    What did he - - what did he tell you about the murder?
> A:    . . . I had asked him just point-blank if he did it, and he said yes.  And then I had asked some questions about, you know, what led up to it and everything.  And it was over her talking to an ex-boyfriend. . . . [E]x-boyfriend or ex-husband, excuse me.
> Q:    Okay.

A:    I had asked him . . . how it happened . . . . And he had told me . . . that he - - he had been mad about it. It had been going on for some time, I guess, that he planned it out. He went to a party over the weekend. I'm assuming it was . . . maybe a Saturday. He had slipped away from the party and had went back to her apartment and had stabbed her.

Q:    Okay. And then what did he say he did?

A:    Went back to the party.

Q:    And did he tell you where this party was?

A:    Just that it was out - - it was in another county.

(Dkt. 13 Ex. 1 vol. XII, Trial Tr. 740-42, Oct. 19, 2007).

As with ground one, the detective's ambiguous statements on the Tape pale in comparison to the testimony of Solomon and Gill that Petitioner confessed to murdering the Victim, cellular telephone tower usage records, and the eye-witness testimony contradicting Petitioner's statements to law enforcement.

Additionally, the detective's statements on the Tape were from an interview that took place on October 17, 2003, which followed an earlier taped interview between Petitioner and law enforcement on October 11, 2003, the day after the Victim's murder. On the third day of trial, the State played the October 11th interview tape wherein Petitioner alluded to his prior criminal history, telling law enforcement: "I do want you to find out what happened to Karen. But not only that, I mean, I've been on the other side, okay, and I know that I don't have the best history. And I know I don't want something to get pinned on me." (Dkt. 13 Ex. 1 vol. X, Trial Tr. 412, Oct. 18, 2007). Thus, even before the jury heard the detective's statements to which Petitioner objects, they had already heard, without objection from Petitioner, statements suggesting Petitioner's prior criminal history, lessening the significance, if any, the detective statements played in Petitioner's conviction.

Consequently, the record shows neither ground one nor ground three warrant habeas relief. Petitioner fails to demonstrate the state appellate court's denial of his appeal was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Grounds one and three are denied.

**Ground Two:**     The trial court erred in not granting continuance when counsel became ill.

In support of ground two, Petitioner argues the trial court's failure to grant his requested continuance violated his right to due process under the Fifth and Fourteenth Amendments. In a table opinion, the state appellate court affirmed the trial court's rulings, judgment, and sentence, thereby denying on appeal this issue. "When a denial of continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process." *Hicks v. Wainwright*, 633 F.2d 1146, 1148-49 (5th Cir. Unit B Jan. 1981) (citing *Gandy v. Alabama*, 569 F.2d 1318, 1323 (5th Cir. 1978)). The Supreme Court has noted that "[t]he matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the [requesting] party fails to offer evidence or is compelled to defend without counsel. *Ungar v. Sarafite*, 376 U.S. 575, 589-90 (1964) (citing *Avery v. Alabama*, 308 U.S. 444 (1940)); *Davis v. Alabama*, 545 F.2d 460, 466 (5th Cir. 1977)

(citation omitted) ("[N]ot every denial of . . . a [continuance] violates one's due process rights or renders ineffective the assistance of his counsel.").

There is no "mechanical test" for determining when "denial of a continuance is so arbitrary as to violate due process." *Ungar*, 376 U.S. at 589. A court must look at the circumstances in each case, "particularly in the reasons presented to the trial judge at the time the request is denied." *Id.* (citing *Nilva v. United States*, 270 F.2d 252 (9th Cir. 1959)); *Herman v. Butterworth*, 744 F. Supp. 1128, 1135 (S.D. Fla. 1989) (stating a petitioner's burden to show he warrants relief due to the denial of a continuance is "extreme").

On the fourth day of trial, the trial court had to decide whether to allow the fifth day of trial to proceed on Saturday, October 20, 2007, or to continue trial on October 23, 2007, a Tuesday. Defense counsel Clapp moved for a continuance until Tuesday, citing defense counsel McClure's worsening illness and claiming McClure was not providing Petitioner effective assistance of counsel due to that illness. On the first day of trial, Clapp had stated to the trial court that McClure had a "severe sinus problem" along with fever and chills, but that neither Petitioner, Clapp, nor McClure wanted a continuance. (Dkt. 13 Ex. 1 vol. VII, Trial Tr. 13, Oct. 16, 2007). Upon the trial court's further inquiry, McClure stated that, despite his illness, he did not "feel bad enough right now . . . to justify asking for a continuance[.]" (Dkt. 13, Trial Tr. 13). McClure continued, "I have a smaller role in this trial than Mr. Clapp does, and most of mine is in the penalty phase if we're going to do that in a week or two hence." (Dkt. 13, Trial Tr. 14). The trial court asked, "Now, is the Defense

telling me this is a significant impairment with your ability to try this case or not?" to which

McClure replied, "No, I'm not.  I'm not."   (Dkt. 13, Trial Tr. 14).

 Addressing Petitioner, the trial court stated:

| | |
|---|---|
| Court: | Okay.  Mr. Permenter, you understand that? |
| Petitioner: | Yes, sir.  Yes, sir, I do. |
| Court: | Okay.  Now, you're not going to move for a continuance because of that; is that right? |
| McClure: | That's correct, Judge. |
| Court: | Okay.  Mr. Permenter, you're in agreement with that decision? |
| Petitioner: | Yes, sir.  That's fine. |

(Dkt. 13, Trial Tr. 15).

 But, the Defense would eventually ask for a continuance, which the trial court denied.

At the end of the fourth day of trial, Friday, October 19, 2007, McClure told the court he

"could go tomorrow," but he did not think he could adequately prepare to present Petitioner's

case on Saturday.  (Dkt. 13 Ex. 1 vol. XIII, Trial Tr. 978, Oct. 19, 2007).  Clapp added that

if the Defense had time over the weekend, "a lot of that prep work for closing can be done[.]"

(Dkt. 13, Trial Tr. 979).  The trial court noted the jury had been told the case would end that

day, October 19.  It had learned some jurors anticipated problems with continuing trial into

the next week, especially as the next Monday was a holiday, and the State had informed the

trial court the Victim's family was traveling from out-of-state to attend the trial while the

Victim's father lay ill in South Carolina.  And the jury had informed the trial court they were

willing to continue trial the next day, Saturday, as well as on Sunday.

 With that in mind, the trial court asked, "[C]an you present your evidence tomorrow,

Defense?" to which Clapp replied, "[Y]es, I believe we can.  However, co-counsel, Mr.

McClure, is seriously ill.  He is not capable of providing effective assistance of counsel to

[Petitioner]. . . . And that's why I was asking for [next] Tuesday, to give [McClure] a chance

to recover."  (Dkt. 13, Trial Tr. 981).  The trial court responded:

> All right.  Defense, I am not gonna wait until Tuesday.  Mr. McClure has been
> . . . present for duty and has participated actively throughout this trial.  And,
> frankly, Mr. McClure, you don't look any different than you did on [last]
> Tuesday. . . . I'm not going to continue the case until [next] Tuesday.  There's
> just too many other considerations, one of which, of course, is letting this jury
> be away from the courthouse that long.

(Dkt. 13, Trial Tr. 981).  Subsequently, Clapp renewed Petitioner's objection to proceeding,

stating, "[I]f we're forced to carry this through . . . I don't think [the Defense] can be

effective.  I really don't.  I'm sorry."  (Dkt. 13, Trial Tr. 983-84).  The trial court replied,

"[Y]ou know, we covered this before this trial even started[,]" and the State added, "Just for

the record . . . it needs to be pointed out they're two very experienced, capable lawyers on

the Defense side, that the way it was set up . . . is Mr. Clapp's pretty much the guilt phase

guy and Mr. McClure is the penalty phase guy, and that's the way it's been kind of going

through. . . . [M]ost cases you only got one lawyer. . . . Well, we've got two lawyers [for

Petitioner] in this case[.]"  (Dkt. 13, Trial Tr. 985).

Upon its inquiry, McClure informed the trial court he was taking antibiotics for his

sinusitis and that he was "really, really tired" and that the Defense needed to confer with

Petitioner on whether he would testify.  (Dkt. 13, Trial Tr. 986).  Clapp later stated, "This - -

this isn't a question of blame.  It's a question of one of the participants can't participate.

He's in pain[,]" to which the trial court replied:

> Counsel, Counsel, you're - - you're - - we've gone over that. You're sort of getting melodramatic here. He's got sinusitis, all right, and he's a little under the weather, all right? Okay? . . . We're toward the end of the State's case. In fact, we're toward the end of the guilt phase[.] . . . We've run Tuesday through Friday with it going real hard every day[.] . . . The only reason to not bring [the jury] back tomorrow is . . . because of Mr. McClure's sinusitis, you say, that basically rises to the level of ineffective assistance of counsel. You've succeeded in putting an issue on this record that we do not need, and it's very hard for me to deal realistically with because I have to also be concerned with all the other issues, okay? . . . Mr. McClure, I appreciate the fact you've got sinusitis, you're tired and you're worn out, and I appreciate that. And, frankly, I'm sure that everybody that's participated here is tired, too. . . . But we're gonna have to resume in the morning [tomorrow].

(Dkt. 13, Trial Tr. 988-90).

The record shows Petitioner suffered no violation to his right to due process pursuant to the Fifth and Fourteenth Amendments because the denial of Petitioner's motion for continuance was not so arbitrary or fundamentally unfair as to violate Petitioner's due process right. Consequently, Petitioner fails to demonstrate the state appellate court's denial of his appeal was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Ground two is denied.

**Ground Four:**       The trial court erred by denying Petitioner's motion for a judgment of acquittal as to first-degree murder.

In support of ground four, Petitioner argues the evidence presented at trial "was insufficient as to the essential element that distinguishes first-degree and second-degree murder[,]" such that no rational trier of fact could "have found the essential elements of the crime beyond a reasonable doubt." (Dkt. 1, Habeas Petition, 11A). Petitioner claims the

State failed to present sufficient evidence Petitioner premeditated the Victim's murder.  As such, Petitioner asserts the trial court violated his Fifth Amendment right to due process when it denied his judgment of acquittal motion.  In a table opinion, the state appellate court affirmed the trial court's rulings, judgment, and sentence, thereby denying on appeal this issue.

As with ground one, ground four  is procedurally barred from federal habeas review.  Petitioner did not fairly present this claim in state court, and attempts to litigate it in state court now would be futile as the time for Petitioner to do so has expired.  In his direct appeal, Petitioner raised this ground only as trial court error, not as a violation of any federal constitutional right.   Petitioner did not cite Supreme Court law or other federal cases addressing this claim in state court.

Even were ground four not procedurally barred, it would fail.  By way of explanation only, the Court will discuss the merits of the claim.  The clearly established federal law which applies to a claim of insufficient evidence is *Jackson v. Virginia*, 443 U.S. 307 (1979).  According to *Jackson*, in order to obtain habeas corpus relief, a petitioner must establish that upon the evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  *Jackson*, 443 U.S. at 324.  Under a due process analysis, the State must establish each element of the charged offense beyond a reasonable doubt.  *Bishop v. Kelso*, 914 F.2d 1468, 1470 (11th Cir. 1990) (citing *Jackson*, 443 U.S. at 316).

Under *Jackson*, "federal courts must look to state law for the substantive elements of the criminal offense, but to federal law for the determination of whether the evidence was sufficient under the Due Process Clause." *Jones v. Sec'y Dep't of Corrs.*, No. 11-10403, 2013 WL 104818, at *1, *1 (11th Cir. Jan 8, 2013) (unpublished) (citing *Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2064 (2012). The *Jackson* evidence sufficiency standard is equally applicable to direct or circumstantial evidence. *Jackson,* 443 U.S. at 320; *United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011), *cert. denied* 132 S. Ct. 1648 (2012); *United States v. Peddle,* 821 F.2d 1521, 1525 (11 Cir.1987). Even if the evidence at trial gave some support to Petitioner's claim that the Victim's murder was not premeditated, that does not warrant the grant of habeas relief. *Wilcox v. Ford,* 813 F.2d 1140, 1143 (11th Cir. 1987) (citing *Martin v. Alabama,* 730 F.2d 721, 724 (11 Cir.1984)). It is not necessary that all facts favor the State for a judgment of acquittal to be properly denied, *Cosby v. Jones*, 682 F.2d 1373, 1383 n.21 (11th Cir. 1982), and the State "is not required to rule out every hypothesis except that of the guilt of the defendant. *Johnson v. Alabama*, 256 F.3d 1156, 1172 (11th Cir. 2001) (citing *Jackson*, 443 U.S. at 326).

A review of the record in the light most favorable to the State shows a rational factfinder could have found Petitioner guilty beyond a reasonable doubt of premeditated first-degree murder pursuant to Florida law. Under Florida law, first-degree murder consists of "the unlawful killing of a human being . . . when perpetrated from a premeditated design to effect the death of the person killed or any human being[.]" Fla. Stat. § 782.04(a)(1). "Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious

purpose to kill." *Green v. State*, 715 So. 2d 940, 943 (Fla. 1998).  This purpose to kill must exist for such a time before the homicide "to permit reflection as to the nature of the act to be committed and the probable result of that act." *Id.* at 944.  Premeditation can be shown by circumstantial evidence.  *See Woods v. State*, 733 So. 2d 980, 985 (Fla. 1999).

> Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.

*Green*, 715 So. 2d at 944.

State's witness Gill testified Petitioner confessed he had planned the Victim's murder.  In addition, the record shows the Victim had sixteen stab wounds, four of which would have been fatal alone.  A medical examiner testified a deep fatal stab wound to the back partially severed the Victim's spinal cord, paralyzing her from the waist down and leaving her unable to escape her attacker or resist except by use of her upper torso.  Forensic analysis showed the Victim had Petitioner's DNA under or on her fingernails.  The examiner also testified that the Victim's forearms and hands had defensive wounds indicating she struggled against her attacker before succumbing to her wounds, which included three more fatal stabs to her neck and chest.  Finally, an expert testified the Victim did not write R-O-C on the wall, making its presence consistent with a pre-conceived plan to murder the victim by an attacker familiar with the Victim's personal life and prior relationship history.  Petitioner's interview with law enforcement on October 11, 2003, revealed he knew the Victim's ex-boyfriend, Roc, spelled his first name, R-O-C, rather than R-O-C-K.

Based on the record, a rational factfinder could have found Petitioner guilty beyond a reasonable doubt of first-degree murder of the Victim.   The trial court's denial of Petitioner's judgment of acquittal motion did not violate his Fifth Amendment right to due process.   Consequently, Petitioner has not shown the state appellate court's denial of his appeal was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   Ground four is denied.

**<u>Ground Five:</u>**      Trial counsel was ineffective due to an illness which diminished his faculties during trial.

In support of this ground, Petitioner argues that the illness of McClure, his penalty-phase defense counsel, and the medication McClure took for that illness, rendered McClure drowsy, gave him trouble speaking, and caused him to leave the courtroom at times during guilt-phase testimony.  Petitioner states, "Due to [McClure's] illness, [McClure] was unable to function in his full mental capacity to defend and be able to cross-examine the witnesses." (Dkt. 1, Habeas Petitioner, 13B).  Petitioner claims this violated his Sixth Amendment right to effective assistance of counsel.  Petitioner places great reliance on defense counsel Clapp's statements to the court that Clapp and McClure were not providing Petitioner effective assistance of counsel due to McClure's illness.  Petitioner raised this issue before the state post-conviction court, which denied his 3.850 Motion, and the state appellate court affirmed that denial without a written opinion.

Much of the same facts recited in ground two are pertinent to this claim and there is no need to repeat them here.  In denying Petitioner's 3.850 motion, the trial court stated:

> At the conclusion of testimony, the trial court inquired of both sides whether they would like to continue over the weekend[, on Saturday October 20, 2007]. The State agreed but defense counsel, Mr. Clapp, informed the trial court that his co-counsel was ill and was not acting as an effective counsel. Nevertheless, the trial court ruled that the trial would continue[.] . . . [I]t was pointed out that Mr. McClure was the primary counsel for the penalty phase of trial which would begin later the following week and at which Mr. McClure was successful because the Defendant did not receive the death penalty. . . . [A]s Mr. McClure was not the primary counsel for the guilt phase of trial, the Defendant cannot show how counsel was ineffective or how he was prejudiced.  Consequently, this motion is denied.

(Dkt. 13 Ex. 1 vol. 10, Trial Court Order Denying Petitioner's Motion for Postconviction Relief, 2).

Here, Petitioner cites no specific incident where he believes McClure's malady resulted in a failure to provide effective assistance to Petitioner.  Petitioner also cites no specific examples of how McClure's illness prejudiced him, other than stating that the outcome of his trial, his conviction and the jury's finding he should be executed, proved he had been prejudiced due to McClure's allegedly ineffective assistance.  Neither Petitioner's nor Clapp's assertion that Petitioner did not receive effective assistance of counsel due to McClure's illness make it so.  The record shows McClure was Petitioner's primary penalty-phase counsel while Clapp was primarily responsible for the guilt-phase of Petitioner's trial.  Petitioner does not assert, nor does the record support, that Clapp performed ineffectively at trial.  In addition, McClure's illness did not prevent him from participating in the guilt-phase of trial, where he cross-examined witnesses and assisted Clapp.

And McClure was not ineffective during the penalty-phase of trial, his acknowledged primary area of responsibility. McClure indisputably performed effectively there, as he succeeded in averting the death penalty, securing instead a sentence of life imprisonment for Petitioner. Consequently, Petitioner has not shown the state appellate court decision affirming the denial of his motion for post-conviction relief was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Ground five is denied.

## CONCLUSION

Since Petitioner's claims can be refuted from the record, no evidentiary hearing is necessary. Having determined that each claim should be denied, the Petition for Writ of Habeas Corpus will be denied.

It is therefore ORDERED AND ADJUDGED that:

1.    The Petition for Writ of Habeas Corpus (Dkt. 1) is DENIED.

2.    The Clerk is directed to enter judgment in favor of Respondent and against the Petitioner, terminate any pending motions, and close this file.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court

must first issue a certificate of appealability ("COA").  *Id.*  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  *Id.* at § 2253(c)(2).  To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).  Petitioner has not made the requisite showing in these circumstances.  Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

**DONE** and **ORDERED** in Tampa, Florida on May 21, 2013.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

F:\Docs\2012\12-cv-1622.deny 2254.wpd